IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

TERRY D. HUINKER,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

No. C13-2085

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     **INTRODUCTION** ........................................ 2

II.    **PRINCIPLES OF REVIEW** ................................ 2

III.   **FACTS** ................................................ 4
     A.     *Huinker's Education and Employment Background* ............ 4
     B.     *Administrative Hearing Testimony* ........................ 4
          1.     *Huinker's Testimony* ............................... 4
          2.     *Joann Huinker's Testimony* ........................ 4
          3.     *Vocational Expert's Testimony* ..................... 5
     C.     *Huinker's Medical History* ............................. 6

IV.   **CONCLUSIONS OF LAW** ................................ 11
     A.     *ALJ's Disability Determination* ......................... 11
     B.     *Objections Raised By Claimant* ......................... 13
          1.     *Severe Impairment* .............................. 14
          2.     *Credibility Determination* ......................... 17
          3.     *Evaluation of Opinions from Treating Sources* .......... 21
          4.     *RFC Assessment* ................................ 26
          5.     *Hypothetical Question* ........................... 29

V.    **CONCLUSION** ........................................ 30

VI.   **ORDER** .............................................. 31

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 2) filed by Plaintiff Terry D. Huinker on December 13, 2013, requesting judicial review of the Social Security Commissioner's decision to deny him Title II disability insurance benefits.[1] Huinker asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits. In the alternative, Huinker requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id*.

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id*. (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

---

[1] On December 27, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id*. at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id*. Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary

3

outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

### A. Huinker's Education and Employment Background

Huinker was born in 1968. He did not graduate from high school, but later earned a GED. His past relevant work experience consists of being a residential care worker, propane salesman, and service worker.

### B. Administrative Hearing Testimony

#### 1. Huinker's Testimony

At the administrative hearing, Huinker testified that since 2010, he has worked part-time, 9:00 p.m. to 1:00 a.m., at Four Oaks, a children's residential treatment center in Cedar Rapids, Iowa. Huinker indicated that he generally works 8 hours per week. At other times he stated that he worked 16-20 hours per week. The ALJ inquired what Huinker believes is his biggest obstacle to being able to work full-time, instead of part-time. Huinker replied that his biggest obstacle is problems with his ability to concentrate. For example, Huinker stated that he sometimes has difficulty engaging in conversations with others because he loses track of what he is saying. Huinker also indicated that his ability to work at a full-time level is compromised by low energy and pain in his back and upper body. He described irregular sleeping habits due to a combination of pain and side effects of medication. Huinker further testified that he has problems with his hands. He stated he has difficulty writing with a pen or doing data-entry type work.

#### 2. Joann Huinker's Testimony

Huinker's wife, Joann Huinker ("Joann"), also testified at the administrative hearing. The ALJ asked Joann what she thought is Huinker's biggest obstacle to working full-time. Joann responded that Huinker's biggest obstacle to working full-time is dealing

4

with pain. She stated "[t]he more he works, the worst [*sic*] he gets, the more medications he has to take."[2] Joann also stated that Huinker's difficulties with concentration limit his ability to work full-time.

### 3.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie Svec with a hypothetical for an individual who can perform:

> light work . . . [e]xcept that rather than the ability to occasionally lift 20 pounds[,] . . . he can only lift 10 pounds occasionally . . . and 10 pounds frequently. So it's kind of a reduced level of light work, but in terms of being -- standing and walking, it would be the same as light work. And secondly, . . . the individual can do no more than frequent handling, fingering, and touching. So that would be up to two-thirds of the time, but no more than that. And finally assume that the individual is limited to doing only simple routine and repetitive work, with no close attention to detail, and no use of independent judgment on the job.

(Administrative Record at 93-94.) The ALJ instructed the vocational expert not to consider the hypothetical in context of Huinker's past relevant work. Accordingly, the vocational expert testified that under the limitations set forth in the hypothetical, Huinker could perform the following jobs: (1) parking lot attendant (350 positions in Iowa and 18,000 positions in the nation), (2) library attendant (1,800 positions in Iowa and 100,000 positions in the nation), and (3) sorter (1,500 positions in Iowa and 93,000 positions in the nation).

Huinker's attorney also questioned the vocational expert:

> Q:    If I modified the first hypothetical to occasional fingering, would any of those three jobs fit within that?
> A:    No.

---

[2] Administrative Record at 82.

Q: If I modified the first hypothetical to include that he would need to take frequent irregular breaks, would that preclude all employment?

A: It would. . . .

Q: If he is limited to no more than a four-hour workday, does that preclude all competitive employment?

A: It does.

(Administrative Record at 95-96.)

### C. Huinker's Medical History

On March 27, 2009, Huinker was referred to Dr. Tork J. Harman, M.D., for consultation on low back pain. In reviewing Huinker's back pain history, Dr. Harmon noted that:

> [Huinker] has a history of low back pain with self-limited episodes over the past several years. Over the past 2 years or so, it has become particularly bothersome. . . . He denies any specific traumatic injury to his spine or any prior operations on his back. His main pain is across his low back from hip-to-hip with some radiation to his right buttock and posterior thigh and occasional pain down the left lateral thigh but not below the knee. He denies any frank numbness or tingling of his lower extremities. . . . His sleep is occasionally broken. He is on a 10-pound lifting restriction at work.

(Administrative Record at 347.) Upon examination, Dr. Harman diagnosed Huinker with chronic nonspecific low back pain, which is mechanical axial in nature. Dr. Harman further noted that he found "[n]o high-grade impingement or evidence of radiculopathy."[3] Dr. Harman administered a epidural steroid block in Huinker's spine as treatment.

Huinker returned to Dr. Harman in June 2009. He continued to complain of low back pain. Dr. Harman noted that Huinker's pain "is worse when he is lifting or stuck in one position for too long. When he changes positions frequently, he gets relief. When he

_____

[3] Administrative Record at 348.

is seated, he does have relief for a while."[4]  Dr. Harman administered radiofrequency neurolysis as treatment.

On November 4, 2009, long-time treating source, Michael Michilides, PA-C, opined that Huinker "is permanently disabled as he cannot lift over 10 pounds or do any repetitive work motion."[5]  In December 2009, Michilides restricted Huinker to lifting no more than 10 pounds with his right arm, and no bilateral repetitive movement due to chronic pain and eight right arm surgeries.  On January 19, 2010, due to his medical condition, Michilides restricted Huinker to working a maximum of 20 hours per week with 4 to 5-hour shifts.  On February 5, 2010, Michilides determined that "[b]ecause of chronic medical problems, and medications required to help control his chronic medical problems, Mr. Huinker needs to be limited to 16 hours a week of work, no more than 4 hours a day 4 days a week in order to keep his medical conditions from worsening."[6]  On March 22, 2010, Michilides filled out a "Physical Ability Assessment Form."  Michilides found that Huinker could occasionally (less than 2.5 hours in an eight-hour workday):  sit, stand, walk, reach in all directions, finger, grasp, lift 10-20 pounds, carry 10-20 pounds, push/pull 60 pounds, climb, balance, stoop, kneel, crouch, and crawl.

On June 28, 2010, Dr. George M. Harper, Ed.D., Huinker's treating psychologist, provided the Social Security Administration ("SSA") with a letter discussing Huinker's mental health.  Dr. Harper noted that Huinker suffers from chronic physical pain which is only partially managed with pain medication.  As a result, the chronic pain has led to

---

[4] *Id*. at 343.

[5] *Id*. at 331.

[6] Administrative Record at 322.

major depression "which is having a significant impact on [Huinker's] mental functioning."[7] Regarding Huinker's functional abilities, Dr. Harper opined that:

> In regard to [Huinker's] ability to remember and understand instructions, procedures, and locations, this psychologist would estimate that his capacity is moderately impaired largely because of his depression. Also Mr. Huinker's ability to carry out instructions, maintain attention, concentration and pace are also moderately limited because his depression is interfering with his ability to concentrate which, in turn, interferes with his ability to remember. On the other hand, Mr. Huinker is capable of interacting appropriately with supervisors, co-workers and the public except when his pain has become quite intense and has become the focus of his mental activity. His ability to use good judgment and respond appropriately to changes in the work place appears to be mildly to moderately impaired as a result of his depression.

(Administrative Record at 385.)

On July 16, 2010, Dr. Matthew Byrnes, D.O., reviewed Huinker's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Huinker. Dr. Byrnes determined that Huinker could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull frequently with his right upper extremity. Dr. Byrnes also determined that Huinker could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Byrnes found that Huinker could not reach overhead with his right upper extremity, and he was limited to frequent gross manipulation. Dr. Byrnes found no visual, communicative, or environmental limitations.

---

[7] *Id.* at 385.

On July 27, 2010, Dr. Aaron Quinn, Ph.D., reviewed Huinker's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Huinker. On the Psychiatric Review Technique assessment, Dr. Quinn diagnosed Huinker with major depressive disorder. Dr. Quinn determined that Huinker had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Quinn determined that Huinker was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. Dr. Quinn concluded that:

> [Huinker] is expected to have work-related difficulties with extended attention, detailed instructions, stress management, pace, and change. [He] retains the ability to complete at least simple repetitive tasks on a sustained basis if he [is] motivated to do so.

(Administrative Record at 409.)

On September 10, 2010, Dr. Harper provided SSA with another letter assessing Huinker's mental health and functional abilities. Dr. Harper opined that Huinker's ability to remember and understand instructions, procedures, and locations is mildly impaired due to his pain and depression. Dr. Harper noted, however, that Huinker "takes pain medication which makes it even more difficult [for him] to remember and understand instructions, procedures and locations placing him at the moderate to severe level when he is under the influence of his pain medicine."[8] Similarly, Dr. Harper found that Huinker's ability to carry out instructions, maintain attention, concentration, and pace are mildly

---

[8] Administrative Record at 445.

limited due to his pain and depression, but are moderately to severely limited when taking his pain medication. Again, Dr. Harper opined that in general, Huinker's ability to interact appopriately with supervisors, co-workers, and the public, and respond appropriately to changes in the workplace is mildly limited due to pain and depression, but moderately to severely limited when factoring in Huinker's need to take medication.

On February 7, 2011, Dr. Harper provided Huinker's attorney with a letter discussing Huinker's functional abilities. Dr. Harper opined that Huinker was satisfactorily meeting the requirments for dealing with attendance, following instructions, and interacting appropriately with supervisors, co-workers, and the general public. Dr. Harper further stated that "I believe that [Huinker's] reduction in hours and some minor improvement in pain management have made it possible for him to satisfy these demands during a four hour work day."[9] Dr. Harper also opined that:

> I believe that since the reduction in his work hours he has been able to manage work demands more effectively, in the past, when he was attempting to work a "normal" work week of roughly 40 hours I believe that Mr. Huinker was experiencing more significant problems with his pain and/or side effects from his medications which were interfering with his ability to complete his work tasks.

(Administrative Record at 605.)

On February 16, 2012, at the request of Huinker's attorney, Michilides and Dr. William R. Thompson, M.D., filled out a check-box form questionnaire regarding Huinker's functional abilities. Michilides and Dr. Thompson found that Huinker could occasionally (up to 1/3 of a workday) handle, finger, and reach. Michilides and Dr. Thompson also limited Huinker to lifting no more than 10 pounds. Michilides and Dr. Thompson opined that these limitations have been necessary since November 4, 2009, continuing to the present. Michilides and Dr. Thompson further opined that Huinker's

---

[9] *Id.* at 605.

limitations are based on "underlying health issues involving both hands, both arms, and both shoulders, the low back condition, and the chronic pain syndrome associated with these conditions[.]"[10]

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Huinker is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical

---

[10] Administrative Record at 626-627.

11

impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Huinker had not engaged in substantial gainful activity since January 3, 2010. At the second step, the ALJ concluded from the medical evidence that Huinker has the following severe impairments: residuals of thoracic outlet surgery on the right, residuals of multiple surgeries to address nerve entrapment in the right upper extremity, degenerative changes in the lumbosacral

spine, and a mood disorder. At the third step, the ALJ found that Huinker did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Huinker's RFC as follows:

> [Huinker] has the residual functional capacity to perform "light" work . . . except that he is limited to lifting no more than 10 pounds. He is limited to handling, fingering and touching only frequently — up to 2/3 of the workday. He can do only simple, routine, and repetitive work that does not require the use of independent judgment and does not require close attention to detail.

(Administrative Record at 33.) Also at the fourth step, the ALJ determined that Huinker was unable to perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Huinker could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Huinker was not disabled.

### B. Objections Raised By Claimant

Huinker argues that the ALJ erred at step two of the five-step sequential test by failing to fully and fairly develop the record with regard to his left hand, arm, and shoulder impairments. Specifically, Huinker argues that the ALJ should have determined that his left upper extremity problems constitute a severe impairment. Huinker points out that instead of fully and fairly developing the record as to his impairments in both upper extremities, the ALJ instead focused primarily on his right upper extremity impairments, finding only his right upper extremity was severely impaired. Huinker maintains that the "effect of this error is that any symptoms or limitations caused by these disorders were not adequately considered in assessing [his] credibility nor were the symptoms and limitations considered as part of the step 5 RFC analysis."[11] Huinker proceeds to argue that in general, the ALJ failed to properly evaluate his subjective allegations of disability and the

---

[11] Huinker's Brief (docket number 12) at 22.

third-party testimony of his spouse, Joann Huinker. Similarly, Huinker argues that in general, the ALJ failed to properly evaluate the opinions of his treating sources. Lastly, Huinker argues that the ALJ's RFC assessment is flawed. Specifically, Huinker argues that the ALJ's RFC assessment is not supported by substantial evidence. Included in his discussion of the ALJ's RFC assessment, Huinker also argues that the ALJ provided a flawed hypothetical question to the vocational expert at the administrative hearing. Huinker concludes that this matter should be remanded for an award of benefits because "Huinker met his burden of proof at step 4. The ALJ did not meet his burden at step 5 and so benefits must be awarded."[12]

## 1.    *Severe Impairment*

Huinker argues that the "ALJ erred in his assessment at step 2 of the sequential analysis by failing to consider [his] ailments impacting his left hand, arm, and shoulder as severe impairments."[13]    In support of his argument, Huinker asserts that he:

> has had issues with the left shoulder dating back to 1995 when referred for physical therapy by Mr. Michilides. He had numbness and tingling in the left arm in 1998. He underwent the left wrist debridement in 1999. Electrodiagnostic studies performed in 2000 found left carpal and cubital tunnel syndrome with possible thoracic outlet syndrome on the left. These conditions were never addressed surgically. He was seen for left shoulder pain in 2005 by Mr. Michilides. He was seen by Mr. Michilides for the sensation of coldness in both hands in 2009. This issue has persisted thereafter to the final note prior to the hearing.

---

[12] *Id.* at 35.

[13] Huinker's Brief (docket number 12) at 18.

14

Huinker's Brief (docket number 12) at 20-21. Huinker concludes that "[t]he ALJ's failure to consider these disorders as severe impairments at step 2 of the sequential analysis is clear error and warrants reversal."[14]

In response, the Commissioner contends that Huinker's argument is without merit. Specifically, the Commissioner asserts that:

> [Huinker] points to evidence long before the relevant time period to support a finding that a left arm impairment was severe. Although a November 2000, more than nine years before [Huinker's] alleged onset date, electromyography showed "mild" carpal, ulnar, and cubital tunnel syndrome in the left arm, the findings were also attributed to thoracic outlet syndrome. [Huinker] continued to work for many years at substantial gainful activity levels after this finding. . . .
>
> During the relevant time period, [Huinker's] treatment records contain almost no complaints of any left arm symptoms and no specific treatment for any impairment of the left arm. [Huinker] points to no diagnosis during the relevant time period of any left arm impairment or of any treatment for left arm complaints, except for a notation of cold sensation in the hands. . . .
>
> Notably, in the instant case, despite finding only a *right* arm impairment to be severe, the ALJ included limitations in [Huinker's] RFC related to lifting, handling, fingering, and touching with *both* arms.

Commissioner's Brief (docket number 13) at 11-13. The Commissioner concludes that the ALJ's determination at step two with regard to Huinker's severe impairments is correct and supported by substantial evidence in the record as a whole.

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citations omitted). In other words,

---

[14] *Id.* at 22.

if the impairment would only have a minimal effect on a claimant's ability to work, then it would not constitute a severe impairment. *Id.* (citation omitted). The Eighth Circuit Court of Appeals has stated "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing." *Id.* at 708 (citations omitted).

The Court agrees with the Commissioner on this issue. As the Commissioner correctly points out, the only significant objective medical evidence to support a finding of a severe left arm impairment is from November 2000, over nine years prior to Huinker's disability onset date of January 3, 2010. Furthermore, as the Commissioner also pointed out, during the relevant time period there is no evidence of any treatment for a left arm impairment, or any diagnosis of a left arm impairment, except one notation of hand coldness in May 2009, about eight months before Huinker's disability onset date. Significantly, the Court finds that the medical evidence in the record, particularly the medical evidence from the relevant time period, emphasizes Huinker's right arm problems and history of multiple surgies on his right arm. For example, the ALJ stated in his decision that "Mr. Michilides has treated [Huinker] for many years and, obviously, has had numerous opportunities to observe him. . . . His progress notes make little, if any, mention of any significant problem with [Huinker's] left upper extremity."[15] Moreover, the Court agrees with the Commissioner that it is notable that "despite finding only a *right* arm impairment to be severe, the ALJ included limitations in [Huinker's] RFC related to lifting, handling, fingering, and touching with *both* arms."[16] Therefore, under the circumstances, the Court finds that the ALJ's determination at step 2 of the sequential test

---

[15] Administrative Record at 39.

[16] Commissioner's Brief (docket number 13) at 13.

is supported by substantial evidence. *See* Anderson, 696 F.3d at 793. Accordingly, the Court concludes that Huinker's argument on this issue is without merit.

## 2. *Credibility Determination*

Huinker argues that the ALJ failed to properly evaluate his subjective allegations of disability. Huinker further argues that the ALJ failed to properly evaluate statements provided by his wife, Joann Huinker. Huinker maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered both Huinker's testimony and Joann's testimony, and properly evaluated the credibility of his subjective complaints and her third-party testimony.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies

in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

When considering third-party testimony concerning a claimant's symptoms or difficulties with pain, the regulations provide that an ALJ must "'carefully consider any other information you may submit about your symptoms,' including statements 'other persons provide about your pain or other symptoms.'" *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1529(c)(3)); *see also Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008) ("[S]tatements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain."). In other words, an ALJ should not ignore the statements of other parties regarding a claimant's condition. *Willcockson*, 540 F.3d at 881. However, in *Robinson*

*v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992), the Eighth Circuit Court of Appeals determined that failure to provide any reasons for discrediting a third-party witness is not error when support for discrediting such a witness is found in the same evidence used by an ALJ to find that a claimant's testimony is not credible. *See also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995) ("[A]lthough the ALJ failed to list specific reasons for discrediting the testimony of Carol Bennett, it is evident that most of her testimony concerning Lorenzen's capabilities was discredited by the same evidence that discredits Lorenzen's own testimony concerning his limitations."); *Buckner*, 646 F.3d at 559-60 (discussing *Robinson* and *Lorenzen* and applying that reasoning to testimony from the claimant's girlfriend).

In his decision, the ALJ addressed Huinker's subjective allegations of disability and Joann's third-party testimony as follows:

> After careful consideration of the evidence, the undersigned finds that [Huinker's] medically determinable impairments could reasonably be expected to cause at least some of the alleged symptoms. However, [his] statements and the statements of his spouse concerning the intensity, persistence and limiting effects of these symptoms are not fully credible and were not useful for the purpose of determining his functional capacity.
>
> There are several factors that tend to detract from the reliability of [Huinker's] testimony.
>
> For example, he and his spouse said that he sometimes is awake for 36 consecutive hours before his body "shuts down[.]" If one were actually experiencing such troubling symptoms, one would likely report them to a medical source in order to address them. There is no hint in the voluminous record that he has ever mentioned such an extreme problem to any medical source. Therefore, it is likely he does not actually experience those symptoms to the degree he alleged.

He also described "withdrawal" symptoms that begin while he sleeps and cause him to sweat and "throw up[.]" Again, progress notes from the medical sources he has seen say nothing at all about such dramatic problems. Again, it is unlikely he experiences those symptoms to the degree he alleged since he has not reported them or sought to reduce them.

Ms. Huinker testified that "more than once" he has taken medication improperly and, as a result, he was "very ill" and vomited and was "very light-headed" and had "severe sweating[.]" Despite those troubling symptoms, she testified that he does not use any sort of special pillbox or other means to remind him when he is to take medication and indicate whether he has taken it or not. If he were actually experiencing those symptoms, [Huinker] and his spouse would have taken the simple and obvious step of using a container marked and divided to make clear when medication is to be taken and when it has already been taken in order to prevent the complications they described. Since they did not, this casts doubt on their description of his symptoms. . . .

[Huinker] indicated that he washes his hand "constantly[.]" He wrote that he has "no feeling" in his fingertips and that he cannot "grasp a razor" to shave his beard because he has "shaky hands[.]" Again, even with all the medical records in this case, there is no hint that he has diminished sensation in his fingers or that he has some loss of motor control which would cause his hands to shake. These exaggerated statements tend to show that neither [Huinker] nor his spouse is a reliable source of information regarding his functioning.

Both [Huinker] and his spouse indicated he does very little around the house and that he almost never leaves the house except to go to work. Neither of them mentioned that he plays computer games at home. However, he told a psychologist in the summer of 2010 that he enjoyed playing video games because it "distracts him[.]" The next month he told the psychologist he was having some conflict with his spouse because she "accused him of not helping" around the house.

> The psychologist recommended that he "break tasks down into smaller steps playing computer games in between[. . . .]"

> His ability to play computer games tends to show that he is able to maintain sufficient concentration to perform the simple and repetitive work specified in the functional restrictions set out in Finding #5.

(Administrative Record at 35-36.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Huinker's medical history, treatment history, functional restrictions, effectiveness of medications, and activities of daily living in making his credibility determination for both Huinker and Joann. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Huinker's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Huinker's subjective complaints and Joann's third-party testimony, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148; *Willcockson*, 540 F.3d at 880-81. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

**3.    *Evaluation of Opinions from Treating Sources***

Huinker argues that the ALJ failed to properly evaluate the opinions of his treating sources. Huinker argues that the ALJ's reasons for discounting the opinions of his treating sources are not supported by substantial evidence in the record. Specifically, Huinker

asserts that the "so-called inconsistencies cited by the ALJ are not inconsistencies when the record is viewed as a whole."[17] Huinker concludes that this matter should be remanded for further consideration of the opinions of his treating sources.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ

---

[17] Huinker's Brief (docket number 12) at 31.

is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ thoroughly reviewed Huinker's medical history from 2002 to 2012.[18] The ALJ also specifically addressed the opinions of Huinker's treating sources and explained his reasons for discounting such opinions and finding inconsistencies with the record as a whole.[19] For example, the ALJ gave little weight to the opinion that Huinker was only capable of working 20 hours per week in 2010. Specifically, the ALJ determined that little weight should be given to that opinion because "it is not supported by any of the clinical or progress notes. His records have not included any observations

---

[18] *See* Administrative Record at 36-40 (providing thorough review of Huinker's medical history for the time period of 2002 to 2012).

[19] *See Id.*

or examination of [Huinker] or the results of any diagnostic tests that would tend to indicate he cannot work full time."[20] The ALJ further pointed out that:

> Mr. Michilides and his supervisor, Dr. Thompson, have apparently concluded that [Huinker] should get some training for another occupation so that he could be employed at "something that is much less demanding to do than working around a bunch of adolescents at Four Oaks[.]" ([Huinker's] description of his work during his testimony did not indicate that his work was "demanding" at all. He said he is little more than a "babysitter" and that his duties require little more than ascertaining that the residents were still in their rooms during the nighttime hours he worked.) They indicated he might have some problems maintaining his concentration but, as noted above, there is no indication he lacks the concentration on the job at his current employer.
>
> In addition, since they have written that he would benefit from further education, it seems clear that they do not believe his level of concentration would interfere with the performance of simple and repetitive work as indicated in Finding #5.

(Administrative Record at 37.) The ALJ also found these additional inconsistencies:

> Mr. Michilides wrote in January of 2012 that [Huinker] has "problems with supervisors at work who think that he should apparently be able to so [(sic)] some of the work that he is so far excused from doing" due [to] his pain. However, [Huinker] testified at the hearing that, apart from working fewer hours, he is not excused from any duties on the job.
>
> Mr. Michilides also wrote that "It has been at least 3 years since he was able to carry out his job, and even then he had significant pain[.]" Dr. Thompson apparently concurred in that assessment. However, there is no indication at all in the record that [Huinker] was unable to perform job duties for three years. . . .

---

[20] Administrative Record at 36.

The only objective measure of functioning in the record is the capacity evaluation performed in March of 2010. Mr. Michilides adopted the results of that evaluation as his opinion regarding [Huinker's] functioning. However, the evaluation tended to show that [Huinker] had a functional capacity greater than that reflected in Mr. Michilides' latest statement. As noted above, [Huinker] lifted and carried 20 pounds and had full strength in pinching and in using his hands to grip.

(Administrative Record at 39.) Lastly, the ALJ noted that:

At the hearing, [Huinker] testified that the greatest obstacle to working full time was his poor concentration. He later stated that the greatest problems he has is his perception that he would "not be good with the kids" who live at the facility where he works because his "mood" is variable.

However, as noted above, Mr. Michilides and Dr. Thompson have recently written that he should pursue further education. He has been working at his current job (at reduced hours) for two full years. He said he does little more on the job than "babysit" at [(sic)] simply places a chair in the hallway to observe if any clients leave their rooms and then check their rooms every 15 minutes to confirm they are present. He then places his initials on a sheet indicating he perform[ed] the room check.

It seems unlikely that his mood or his concentration would interfere with the performance of those simple duties even if he was working full-time.

(Administrative Record at 39-40.)

Having reviewed the entire record, the Court finds the ALJ properly considered and addressed the opinion evidence provided by Huinker's treating sources. Also, the Court finds the ALJ provided "good reasons" for rejecting the opinions of the treating sources. *See Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions

of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

### 4. RFC Assessment

Huinker argues that the ALJ's RFC assessment is not supported by substantial evidence in the record because the ALJ failed to consider all of his functional limitations. Specifically, Huinker argues that in making his RFC assessment, the ALJ failed to address and consider all of the medical evidence in the record which supports significant functional limitations caused by his inability to use his hands and "nonexertional limitations," presumably his difficulties with mood and concentration. Huinker maintains that this matter should be remanded for further consideration of her RFC.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an

administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In determining Huinker's RFC, the ALJ thoroughly addressed and considered his medical history, including consideration of limitations associated with Huinker's upper extremities and his difficulties with concentration and mood.[21] In general, the ALJ noted that:

> None of the records show any substantial change in [Huinker's] medical condition since the summer of 2009 when he received specialized treatment for his alleged back pain. [Huinker] continued to work full-time for his current employer with no change in his duties for at least the last six months of 2009. He was taking virtually the same medication during that period of full-time work as he has taken since January of 2010.
>
> In April of 2010, the PA-C wrote that [Huinker's] "situation has not changed any. It is still the same. He still has the same problems. He has had trouble in using his right arm for an extended period of time."
>
> Since [Huinker's] condition has not changed in any substantial way since at least June of 2009, there is no basis for an opinion that his functional capacity has changed since then.

---

[21] *See* Administrative Record at 36-40 (providing a thorough discussion of Huinker's overall medical history and treatment).

(Administrative Record at 36-37.) With regard to Huinker's use of his arms and hands, the ALJ noted that in late 2009, shortly before his alleged disability onset date, Huinker:

> participated in an evaluation of his functional capacity — again the context of his application for benefits from his employer.
>
> The report of that evaluation indicates that [Huinker] lifted 20 pounds from the floor to the level of his waist and carried that weight for 30 feet. His lifting and carrying was limited by his alleged low back pain — not by any problems with his shoulders, arms, or hands. [Huinker] was also able to push and pull 60 pounds. He had "4-/5" strength in his upper extremities.
>
> He had about 20 pounds of pinch strength and about 119 pounds of grip strength in his hands. There was no disparity between the functioning in his two hands.

(Administrative Record at 38-39.) Similarly, with regard to Huinker's alleged limitations due to mood and concentration, the ALJ found:

> At the hearing, [Huinker] testified that the greatest obstacle to working full time was his poor concentration. He later stated that the greatest problems he has is his perception that he would "not be good with the kids" who live at the facility where he works because his "mood" is variable.
>
> However, as noted above, Mr. Michilides and Dr. Thompson have recently written that he should pursue further education. He has been working at his current job (at reduced hours) for two full years. He said he does little more on the job than "babysit" at [(sic)] simply places a chair in the hallway to observe if any clients leave their rooms and then check their rooms every 15 minutes to confirm they are present. He then places his initials on a sheet indicating he perform[ed] the room check.
>
> It seems unlikely that his mood or his concentration would interfere with the performance of those simple duties even if he was working full-time.

(Administrative Record at 39-40.) Moreover, as discussed in sections *IV.B.2* and *IV.B.3*, and contrary to Huinker's assertions, the ALJ properly considered the opinions of Huinker's treating sources and Huinker's subjective allegations in making his overall disability determination, including determining Huinker's RFC.

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Huinker's medical records, observations of treating physicians, and Huinker's own description of his limitations in making the ALJ's RFC assessment for Huinker.[22] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Huinker's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

### 5. Hypothetical Question

Huinker argues that the ALJ's hypothetical question to the vocational expert was incomplete because it did not properly account for all of his impairments. Huinker also argues that the ALJ's hypothetical was incomplete and did not contemplate all of his functional limitations. Huinker maintains that this matter should be remanded so that the ALJ may provide the vocational expert with a proper and complete hypothetical question.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v.*

---

[22] Administrative Record at 36-40 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

*Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and discussed both the medical evidence and Huinker's testimony in determining Huinker's impairments.[23] The Court further determines that the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert by the ALJ was based on the ALJ's findings and conclusions, the Court concludes that the ALJ's hypothetical question properly included those impairments which were substantially supported by the record as a whole. *See Goose*, 238 F.3d at 985; *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible). Therefore, the ALJ's hypothetical question was sufficient.

## V. CONCLUSION

The Court finds that the ALJ's determination at step 2 of the sequential test is supported by substantial evidence. The Court also finds that the ALJ properly determined Huinker's credibility with regard to his subjective complaints of disability, and properly determined Joann Huinker's credibility as to her third-party testimony. Furthermore, the Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Huinker's treating sources. Additionally, the Court finds that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Lastly, the ALJ's

---

[23] *See* Administrative Record at 36-40.

hypothetical question to the vocational expert properly included those impairments substantially supported by the record as a whole. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VI. ORDER*

1.    The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 2) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this 8th day of October, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA